UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                        Case No. 1:05-CR-171

JACKSON MCDANIEL,                                               Hon. Gordon J. Quist

        Defendant.
_____/

## OPINION

Defendant Jackson McDaniel was originally charged in a two-count indictment on July 13, 2005, for knowingly and fraudulently making a false entry 1) in a Disclosure statement and exhibits, and 2) in a First Amended Plan of Reorganization, allegedly in violation of 18 U.S.C. § 152(8). On November 10, 2005, a four-count superseding indictment was returned against Defendant. Counts One and Two allege that Defendant, "having devised and intending to devise a scheme and artifice to defraud, and for the purpose of executing and concealing said scheme and artifice," filed materially false documents in a proceeding under Title 11 of the United States Code, in violation of 18 U.S.C. § 157(2). Counts Three and Four allege that Defendant knowingly and fraudulently falsified and made false entries in documents relating to the financial affairs of a debtor, in violation of 18 U.S.C. § 152(8). Defendant, pursuant to Fed. R. Crim. P. 12(b)(2), moves this Court to dismiss the superseding indictment on the ground that the indictment does not state an offense under either 18 U.S.C. § 157(2) or 18 U.S.C. § 152(8).

## I. BACKGROUND

On October 21, 1999, DeWitt Clark Land, LLC ("DeWitt Clark"), of which Defendant was a member, entered into a land contract with James and Ruth Scott for the purchase of 15.5 acres in DeWitt Township, Michigan. (Br. Support Def.'s Mot. Dismiss Superseding Indictment at Ex. 5.) The land contract required DeWitt Clark to pay the Scotts $900,000 by October 21, 2000. (*Id*.) The land contract also required DeWitt Clark to pay the Scotts 8% quarterly interest payments. (*Id*.) On October 27, 2000, the Scotts, in exchange for the continuation of interest payments, agreed to extend the terms of the land contract to April 20, 2001. (*Id*. at Ex. 9.) Ultimately, DeWitt Clark did not pay the Scotts the $900,000 purchase price required by the land contract. Consequently, in late August 2001, the Scotts filed a land contract forfeiture action in state court. On September 14, 2001, DeWitt Clark filed a Chapter 11 bankruptcy petition. (*Id*. at Ex. 7.) The Scotts, as creditors of DeWitt Clark, filed a motion to dismiss the bankruptcy petition. DeWitt Clark's primary asset was its vendee interest in the land contract with the Scotts. On December 13, 2001, DeWitt Clark filed a Plan of Reorganization. The Plan provided that DeWitt Clark intended to pay off its creditors in full by selling the 15.5 acres in which it had a vendee interest to Ferlito Construction, Inc. ("Ferlito") for $1,300,000. On January 14, 2002, DeWitt Clark and the Scotts entered into a settlement agreement to compromise the Scotts' claims against DeWitt Clark. (*Id*. at Ex. 12.) The settlement agreement provided that the Scotts consented to the purchase agreement between DeWitt Clark and Ferlito. (*Id*.) Moreover, it accorded DeWitt Clark 270 days to consummate the transaction with Ferlito. (*Id*.) On February 17, 2002, the Bankruptcy court approved the compromise between DeWitt Clark and the Scotts as set forth in the settlement agreement. (*Id*. at Ex. 15.)

On February 25, 2002, Defendant received a letter from Ferlito's counsel. (*Id*. at Ex. 16.) The letter stated as follows:

> I know you have discussed the transaction with [Ferlito's principal] and that he is hopeful that at some point a deal can be made. However, pursuant to the terms of the contract and to technically comply with its terms, we need to notify you . . . that Ferlito Construction, Inc. hereby terminates the Agreement [to Purchase Real Estate].[1]

(*Id*.)

On May 17, 2002, DeWitt Clark filed with the bankruptcy court a disclosure statement, which Defendant signed on behalf of the debtor. (*Id*. at Ex. 17.) The disclosure statement provided:

> Debtor [DeWitt Clark] will continue to operate in accordance with the Settlement Agreement as previously approved by the Court. Among other things, this means that Debtor will continue to utilize its best efforts to assist in promoting the consummation of the sale of the Property as contemplated by the Settlement Agreement. By its terms, the sale is to be closed on or before October 11, 2002.

(*Id*.)

The Settlement Agreement was incorporated into the disclosure statement. In addition to providing that the purchase agreement between DeWitt Clark and Ferlito was to be completed within 270 days after the settlement agreement was entered into, the Settlement Agreement also provided that if the purchase agreement between DeWitt Clark and Ferlito were terminated prior to the consummation of the sale of the property, the Scotts would be entitled to the immediate receipt of the quit-claim deed for the property. (*Id*. at Ex. 12.)

---

[1] The purchase agreement provided that within five days of Ferlito's receipt of the agreement, it was to deliver $25,000 into an escrow account. Furthermore, the agreement provided, "[i]f, prior to ninety days after the [date the purchase agreement was entered into, Ferlito], at its sole discretion, deems that any condition of the property or any matters relating thereto are unacceptable to it, and so notifies ... [DeWitt Clark] and ... [the] Escrow Agent in writing, the deposit will be promptly returned without further instruction from . . . [Ferlito]." The purchase agreement between DeWitt Clark and Ferlito was entered into on December 4, 2001. Ferlito, through its counsel, notified DeWitt Clark that it was terminating the agreement on February 25, 2002, which was within 90 days of the signing of the purchase agreement.

The First Amended Plan of Reorganization was also incorporated into the disclosure statement. It provided:

> Debtor has received and accepted a bona fide offer for the purchase of the Property . . . , which purchase agreement forms the basis of the Settlement Agreement. The Settlement Agreement and the sale of the Property were approved by the Bankruptcy Court's Order dated February 17, 2002. . . .
>
> The purchase price provided in the purchase agreement is $1,300,000. The sale is to be consummated, in accordance with the terms of the Settlement Agreement and the purchase agreement, not later than 270 days after January 14, 2002.

On June 26, 2002, DeWitt Clark filed the First Amended Plan of Reorganization, as quoted above, with the bankruptcy court. (*Id*. at Ex. 18.) The Defendant signed the Plan on behalf of the Debtor. (*Id*.)

On or about July 30, 2002, the Scotts, through their attorney, contacted Ferlito to discuss Ferlito's agreement to buy the property in question. Ferlito's counsel informed the Scotts' counsel that Ferlito had terminated the deal on February 25, 2002.

On August 5, 2002, the Scotts moved the bankruptcy court to enforce the settlement agreement. Since the settlement agreement provided that the Scotts would be entitled to the immediate receipt of the quit-claim deed if the purchase agreement between DeWitt Clark and Ferlito were terminated prior to the consummation of the sale, the Scotts requested that the bankruptcy court order the escrow agent to immediately release the quit-claim deed to the Scotts. On August 6, 2002, the bankruptcy court granted the Scotts' motion.

The United States Trustee moved for conversion of DeWitt Clark's bankruptcy from Chapter 11 to Chapter 7. The bankruptcy court granted the Trustee's motion and converted the bankruptcy to a Chapter 7. The bankruptcy was closed on March 26, 2003.

## II.  DISCUSSION

Fed. R. Crim. P. 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  A motion to dismiss an indictment for failure to state an offense is a motion that a defendant may raise before trial under Rule 12(b)(2).  Fed. R. Crim. P. 12(b)(2) advisory committee's note (noting that an objection a defendant may raise by motion before trial "include[s] . . . failure of an indictment or information to state an offense . . .").  In deciding a motion to dismiss an indictment for failure to state an offense, a court need simply look to the facts alleged and determine whether those facts, "if proved would establish *prima facie*, the defendant's commission of the crime."  *United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 176 (6th Cir. 1992); *see also United States v. Cruikshank*, 92 U.S. 542, 558 (1875) (noting that an essential object of the indictment is "to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had").  Moreover, in deciding a motion to dismiss an indictment for failure to state an offense, a court may look beyond the face of the indictment so long as the court does not decide disputed factual questions that lie within the province of the jury.  *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992).

### A.  Counts One and Two: 18 U.S.C. § 157(2) - Bankruptcy Fraud

A person violates 18 U.S.C. § 157(2) when, "having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so – . . . (2) files a document in a proceeding under title 11 . . . ."  The Sixth Circuit has recognized that, in order for a defendant to be found guilty of this offense, the government must prove: 1) the existence of a scheme to defraud or intent to later formulate a scheme to defraud, and

2) the filing of a document in a proceeding under title 11, 3) for the purpose of executing or concealing the scheme. *United States v. Wagner*, 382 F.3d 598, 612 (6th Cir. 2004).

It is undisputed that Defendant filed documents in a proceeding under title 11. Defendant argues, however, that the government "cannot prevail on the two count violation of § 157(2) because it cannot establish that [Defendant] filed a . . . document . . . for the purpose of executing or attempting to execute a scheme to defraud." (Br. Supp. Def.'s Mot. Dismiss Superseding Indictment at 9.) Defendant notes that the government must show that he had the specific intent to defraud when he filed the disclosure statement and exhibits on May 17, 2002, and the First Amended Plan of Reorganization on June 26, 2003. Defendant notes that the Settlement Agreement, which was attached as an exhibit to both the disclosure statement filing and the First Amended Plan of Reorganization filing, gave Defendant until October 12, 2002, to complete the Ferlito transaction. Moreover, Defendant points out, the Ferlito letter that the government contends terminated the transaction stated that Ferlito's principal was "hopeful that at some point a deal could be made." Finally, Defendant notes, the disclosure statement provided that the "Debtor w[ould] continue to utilize its best efforts to assist in promoting the consummation of the sale of the Property as contemplated by the Settlement Agreement." "[T]hese facts," (that Defendant had until October 12, 2002, to complete the transaction, that Ferlito was hopeful a deal could be made, and that the disclosure statement provided that Defendant would use his best efforts to consummate the deal as contemplated by the Settlement Agreement), Defendant concludes, "destroy any argument" the

government can make that Defendant had the specific intent to defraud when he filed the disclosure statement and the First Amended Plan of Reorganization. (*Id*. at 11.)[2]

This argument, however, is irrelevant to the issue of whether the facts alleged in the indictment state an offense under 18 U.S.C. § 157(2). Defendant may certainly present to the jury the argument that he did not have the specific intent to defraud when he filed the disclosure statement and the First Amended Plan of Reorganization. Because the superseding indictment alleges that Defendant filed the disclosure statement and the Plan of Reorganization "for the purpose" of executing and concealing a scheme or artifice to defraud, however, the indictment is sufficient with respect to this element of the offense. It is for the jury to decide whether Defendant filed the documents in the bankruptcy proceeding "for the purpose" of executing a scheme to defraud.

Next, Defendant argues that counts one and two of the indictment must be dismissed because they fail to allege facts that constitute a "scheme or artifice to defraud" under 18 U.S.C. § 157(2). Defendant notes that § 157 is patterned on the federal mail fraud statute, 18 U.S.C. § 1341. Both § 157 and § 1341 refer to "devis[ing] or intending to devise any scheme or artifice to defraud." When Congress has repeated the language "devise or intending to devise any scheme or artifice to defraud" in other statutes, courts have looked to decisions under the mail fraud statute in construing the other statutes. *See* 1 *Collier on Bankruptcy* ¶ 7.07[1][a], at 7-119 (15th ed. 2005).

---

[2] Defendant notes that the Congressional Record provides that "bona fide settlements are not intended to be criminal under any provision of [18 U.S.C. § 157]." *Collier*, ¶7.07[1][a], 7-122. Defendant argues that the facts in the indictment cannot state an offense under § 157 because "the central document of the Government's entire case, the Settlement Agreement, was a bona fide settlement agreement entered into in good faith . . . long before the alleged false documents were filed." The government is not alleging that Defendant violated § 157 by entering into the Settlement Agreement. Rather, the government alleges that Defendant violated § 157 because he filed with the bankruptcy court a disclosure statement and a First Amended Plan of Reorganization (both of which included the Settlement Agreement as an attachment) after the deal with Ferlito contemplated by the Settlement Agreement allegedly was terminated.

7

In interpreting § 1341 in *Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365 (2000), the Supreme Court held that § 1341 did not reach false statements made in an application for a state license to operate video poker machines, because "permits or licenses of this order do not qualify as 'property' within § 1341's compass." *Id*. at 15, 121 S. Ct. at 368.  In reaching this conclusion, the Court discussed the history of the statute and its prior cases interpreting the statute.  In *McNally v. United States*, 483 U.S. 350, 107 S. Ct. 2875 (1987), the Court noted, it "reversed the mail fraud convictions of two individuals charged with participating in 'a self-dealing patronage scheme' that defrauded Kentucky citizens of 'the right to have the Commonwealth's affairs conducted honestly.'" *Id*. at 18, 121 S. Ct. at 370 (citation omitted).  "At the time *McNally* was decided," the Court explained, "prosecutors had been using § 1341 to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property." *Id*. at 18-19, 121 S. Ct. at 370 (citation omitted).  The *McNally* court concluded that the history of the mail fraud statute indicated that "the original impetus behind [it] . . . was to protect . . . people from schemes to deprive them of their money or property." *Id.* (citation omitted).

After *McNally*, the Court noted, "Congress amended the law to specifically cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*: 'the intangible right of honest services.'" *Id*. at 19-20, 121 S. Ct. at 371 (citation omitted).  In *Cleveland*, the Court concluded that since "there [was] no assertion that . . . [the state's] video poker licensing scheme implicate[d] the intangible right of honest services," and  since a video poker "license is not 'property' in the government regulator's hand," § 1341 does not reach fraud in obtaining such a license.  *Id*. at 20, 121 S. Ct. at 371.  To "clarify," the Court explained, "[i]t does not suffice . . . that

8

the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id*. at 15, 121 S. Ct. at 358.

Defendant argues that a scheme to defraud under § 157, as with a scheme to defraud under § 1341, must be designed to deprive a victim of property in the victim's hands. The government fails to allege, Defendant contends, that he intended to deprive the Scotts of their property. Rather, Defendant maintains, "there is no evidence of a scheme to deprive the Scotts of their property as they received exactly what they bargained for: $6,000 a month [in interest payments] and the return of their property if it w[ere] not sold by October 12, 2002." (Def.'s Reply Br. Supp. Mot. Dismiss Superseding Indictment at 3.)

It is true, of course, that the Scotts received their bargained for rent payments while DeWitt Clark was in possession of the property, and that they received the possession of the property by October 12, 2002, as required by the Settlement Agreement if the property were not sold to Ferlito by October 12, 2002. However, Defendant's argument that the Scotts were not deprived of property ignores the provision in the Settlement Agreement that provides that the Scotts would be entitled to the immediate receipt of the property if the purchase agreement with Ferlito were terminated prior to the consummation of the sale of the property. (Br. Support Def.'s Mot. Dismiss Superseding Indictment at Ex. 12.) Thus, Defendant's filing of the disclosure statement and the First Amended Plan of Reorganization, which allegedly created the false impression that the purchase agreement with Ferlito not only had not been terminated but rather was on track, deprived the Scotts of their right to possess, use, and possibly sell, the property at the moment the purchase agreement was allegedly terminated.

This property interest that the Scotts were deprived of is not in the mold of the "intangible interests unrelated to money or property" that the Supreme Court explained in *Cleveland* could not be the object of a scheme to defraud. 531 U.S. at 18, 121 S. Ct. at 370. Rather, at the moment of default, the right to possess, use, and sell the property rightfully rested in the Scotts' hands. Defendant's allegedly fraudulent misrepresentation as to the occurrence of the default, then, deprived the Scotts of their right to possess, use, and sell the property at the moment of default.

### B. Counts Three and Four: 18 U.S.C. § 152(8)

A person violates 18 U.S.C. § 152(8) when that person, "after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor." The superseding indictment alleges that Defendant falsified and made false entries in a disclosure statement and exhibits and in a First Amended Plan of Reorganization.

First, even if a disclosure statement and a plan of reorganization could constitute "recorded information relating to the property or financial affairs of a debtor," the alleged false statements in the disclosure statement and exhibits and in the First Amended Plan of Reorganization do not constitute "false entries" under the statute. A "false entry" is an "untrue statement of items of account . . . ." Black's Law Dictionary 540 (5th ed. 1979). And an "account" is "[a] statement of pecuniary transactions; a record or course of business dealings between parties; a list or statement of monetary transactions, such as payments, losses, sales, debits, credits, . . . in most cases showing a balance or result of comparison between items of an opposite nature." *Id*. at 17. The alleged false statements in the disclosure statement and exhibits and in the First Amended Plan of Reorganization

could not, as a matter of law, constitute false *entries*, as they are not untrue statements of items in a statement of the debtor's pecuniary transactions or records of the debtor's business dealings.

Second, although when defined broadly, a disclosure statement and a plan of reorganization could be considered recorded information relating to the financial affairs of a debtor, in that they are documents that detail how a debtor plans to use his property to satisfy creditors, in light of the purpose of § 152, such a construction is impermissible. Section 152(8) "was added in 1926 in an effort to ensure the integrity of financial recordkeeping related to debtors." *Collier*, ¶ 7.02[8], at 7-83. The prohibitions (shall not conceal, destroy, mutilate, falsify, or make a false entry) listed in the statute "seek to prevent the alteration or creation of information used to reconstruct the extent of the debtor's holdings or the debtor's financial dealings." *Id*. ¶ 7.02[8][a][i], at 7-84. This way, the representative of the estate can accurately determine and collect the debtor's assets so that he can then equitably distribute them to the debtor's creditors. *Id*. ¶7.02[8][a][iii], at 7-85. A disclosure statement and a plan of reorganization do not relate to a debtor's "financial recordkeeping."

Finally, to the extent there is any ambiguity as to whether § 152(8) criminalizes a false statement in a disclosure statement and in a plan of reorganization, the rule of lenity requires this Court to resolve it "by reading the statute narrowly in order to encourage Congress to speak clearly, thus giving the populace 'fair warning' of the line between criminal and lawful activity, and in order to have the Legislature, not the courts, define criminal activity." *McElroy v. United States*, 455 U.S. 642, 658, 102 S. Ct. 1332, 1341 (1982). Moreover, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct.

1219, 1225 (1997). No judicial decision has interpreted § 152(8)'s requirement of a "recorded information . . . relating to the property or financial affairs of a debtor" to include documents other than the debtor's business or financial records. *See United States v. Brown*, 943 F.2d 1246, 1252-53 (10th Cir. 1991) (defendant convicted under § 152(8) for throwing financial records relating to the debtor in a public landfill); *United States v. Center,* 853 F.2d 568, 571 (7th Cir. 1998) (debtor convicted under § 152(8) for fraudulently executing documents and book entries assigning a debt to a creditor's wholly-owned corporation); *Fine v. United States*, 55 F.2d 9 (7th Cir. 1932) (defendant convicted under § 152(8) for executing false corporate minutes and fictitious bill of sale).

### C.  Vindictive Indictment

Finally, Defendant argues that the superseding indictment should be dismissed because it is vindictive. He notes that the government procured the return of a superseding indictment shortly after the government responded to Defendant's motion to dismiss the original indictment. Moreover, he notes, although the superseding indictment is based on the same conduct charged in the original indictment, the superseding indictment "adds charges that could potentially result in an additional 10 years of imprisonment."[3] (Def.'s Reply Br. Supp. Mot. Dismiss Superseding Indictment at 6.) Thus, Defendant maintains, "the only conceivable basis for th[e] superseding indictment was to increase the potential penalties for th[e] [D]efendant having the temerity to file

---

[3] Defendant asserts that while the original indictment contained only two charges, with each charge carrying a maximum sentence of five years, for a total potential sentence of ten years, the superseding indictment contains four charges, and, with each charge carrying a maximum sentence of five years, the total potential sentence under the superseding indictment is twenty years. It is theoretically possible that Defendant, if found guilty on all four counts in the superseding indictment, could be sentenced to *consecutive* sentences, thus resulting in a 20 year prison term, as there is no statute precluding the imposition of consecutive sentences here. The sentencing guidelines, however, provide that if a "sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S. Sentencing Guidelines Manual § 5G1.2(c). It is questionable, moreover, whether four consecutive sentences on the counts alleged in the superseding indictment would constitute a "reasonable" sentence, as required by *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005).

12

a . . . [m]otion to [d]ismiss." (Br. Supp Mot. Dismiss Superseding Indictment at 13). Therefore, Defendant concludes, the superseding indictment must be dismissed "because there exists 'a realistic likelihood of vindictiveness.'" (*Id*. at 14) (quoting *United States v. Poole*, 407 F.3d 767, 775 (6th Cir. 2005)).

"It is undeniable that due process prohibits an individual from being punished for exercising a protected statutory or constitutional right." *Poole*, 407 F.3d at 774 (citing *United States v. Goodwin*, 457 U.S. 368, 372, 102 S. Ct. 2485, 2488 (1982)). For purposes of determining whether a prosecutor's conduct poses a realistic likelihood of vindictiveness, a court considers the "prosecutor's 'stake' in deterring the exercise of a protected right and the unreasonableness of [the prosecutor's] actions." *Poole*, 407 F.3d at 774.

For instance, in *Blackledge v. Perry*, 417 U.S. 21, 94 S. Ct. 2098 (1974), the Supreme Court found that a realistic likelihood of vindictiveness existed where a defendant faced increased punishment after appealing his conviction. 417 U.S. at 27-28, 94 S. Ct. at 2102-03. In *Perry*, the defendant was convicted of a misdemeanor assault in an inferior court having exclusive jurisdiction for the trial of misdemeanors. *Id*. at 22, 94 S. Ct. at 2099. The court sentenced the defendant to six months in prison. *Id*. at 22, 94 S. Ct. at 2100. Under North Carolina law, a person convicted in the inferior court has the absolute right to a trial *de novo* in the superior court. *Id*. After the defendant filed his notice of appeal, the prosecutor obtained a felony indictment charging him with assault with a deadly weapon. *Id*. at 23, 94 S. Ct. at 2100. The defendant pled guilty to the indictment in the superior court, "and was sentenced to a term of five to seven years . . . ." *Id*. In finding a realistic likelihood of prosecutorial vindictiveness, the Court observed:

> A prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial *de novo* in the Superior

> Court, since such an appeal will clearly require increased expenditures of prosecutorial resources . . . . And, if the prosecutor has the means readily at hand to discourage such appeals – by 'upping the ante' through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy — the State can insure that only the most hardy defendants will brave the hazards of a *de novo* trial.

*Id*. at 27-28, 94 S. Ct. at 2102.

In *Goodwin*, the Court addressed the issue of prosecutorial vindictiveness in the pretrial context. 457 U.S. at 380-81, 102 S. Ct. at 2492-93. Goodwin was charged in a United States District Court "with several misdemeanor and petty offenses, including assault" of a federal officer. 457 U.S. at 370, 102 S. Ct. at 2487. "Goodwin was . . . arraigned before a United States Magistrate. The Magistrate set a date for trial, but [Goodwin] fled the jurisdiction." *Id*. Goodwin was eventually found, and an attorney from the Department of Justice began plea negotiations with him. *Id*. at 370-71, 102 S. Ct. at 2487. Goodwin "advised the government that he did not wish to plead guilty and desired a trial by jury in the District Court." *Id*. at 371, 102 S. Ct. at 2487. "The case was transferred to the District Court and responsibility for the prosecution was assumed by an Assistant United States Attorney." *Id*. "[A]fter reviewing the case, . . . the prosecutor obtained a four-count indictment charging [Goodwin] with one felony count of forcibly assaulting a federal officer and three related counts arising from the same incident." *Id*.

In considering Goodwin's claim of prosecutorial vindictiveness, the Court observed:

> There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized.

*Id*. at 381, 102 S. Ct. at 2492-93.  Moreover, the Court explained, "a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. Defense counsel routinely file pretrial motions to, [for instance], . . . challenge the sufficiency . . . of an indictment . . . . It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter."  *Id*. at 381, 102 S. Ct. at 2493.  Thus, the Court concluded, a "prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution.  An initial decision should not freeze future conduct."  *Id*. at 382, 102 S. Ct. at 2493.

In *United States v. Branham*, 97 F.3d 835 (6th Cir. 1996), the Sixth Circuit addressed a claim of prosecutorial vindictiveness similar to the argument Defendant makes here.  In *Branham*, the defendant moved to dismiss the indictment, alleging that it was insufficient on its face.  97 F.3d at 840.  The district court denied defendant's motion to dismiss.  *Id*.  Subsequently, a superseding indictment was returned against the defendant, containing an additional charge.  *Id*.  Defendant argued "that the prosecutor filed the superseding indictment in retaliation for [defendant's] earlier motion to dismiss."  *Id*. at 849.  The court denied defendant's prosecutorial vindictiveness claim, noting that the government's conduct of charging an additional claim in a superseding indictment in the pre-trial stage of the prosecution "was well-within the parameters set forth in *Goodwin*."  *Id*. at 850.

Similarly, here, the prosecutor's decision to add two counts in a superseding indictment after Defendant filed a motion to dismiss the original indictment was well within the parameters set forth in *Goodwin*.  As the Court explained, "at this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized."  *Id*. at 381, 102 S. Ct. at 2492-93.

After reviewing Defendant's motion to dismiss, the prosecutor may have realized that the sufficiency of the original counts were suspect. Moreover, upon a closer examination of the bankruptcy criminal statutes, the prosecutor may have realized that the conduct alleged, if not covered by § 152(8), may have violated § 157(2). "It is unrealistic to assume," therefore, that the prosecutor, in obtaining a superseding indictment, sought to penalize Defendant for the filing of his motion to dismiss. *Id.* at 381, 102 S. Ct. at 2493.

### III. CONCLUSION

For the above stated reasons, the Court will deny Defendant's motion to dismiss Count One and Two of the Superseding Indictment, grant Defendant's motion to dismiss Count Three and Four of the Superseding Indictment, and deny Defendant's motion to dismiss the Superseding Indictment on the ground of prosecutorial vindictiveness.

An Order consistent with this Opinion will be entered.


Dated: March 28, 2006                                         /s/ Gordon J. Quist
                                                         GORDON J. QUIST
                                                     UNITED STATES DISTRICT JUDGE